2013 COA. 42

Sara L. BURNETT, Plaintiff–Appellant,

v.

STATE of Colorado, DEPARTMENT OF NATURAL RESOURCES, DIVISION OF PARKS AND OUTDOOR RECREATION, Defendant–Appellee.

No. 11 CA2141

Colorado Court of Appeals, Div. V.

Announced March 28, 2013

**854**

Law Firm of Alan G. Molk, Alan G. Molk, Englewood, Colorado; The Fowler Law Firm, LLC, Timms R. Fowler, Fort Collins, Colorado, for Plaintiff–Appellant.

John W. Suthers, Attorney General, Kathleen L. Spaulding, Senior Assistant Attorney General, Denver, Colorado, for Defendant–Appellee.

Keating Wagner Polidori Free, P.C., John F. Poor, Denver, Colorado, for Amicus Curiae The Colorado Trial Lawyers Association.

Opinion by JUDGE FOX.

¶ 1 Sara L. Burnett appeals the trial court's judgment dismissing her negligence claim against the Colorado Department of Natural Resources (CDNR). She contends that the trial court erred in determining that the CDNR did not waive immunity for her injuries under the Colorado Governmental Immunity Act (CGIA), section 24–10–106(1)(e), C.R.S.2012. Because we conclude that there is no waiver of immunity under the CGIA for dangerous conditions in an unimproved area within a state park, we affirm the trial court's dismissal.

## I.  Background

¶ 2 The facts recited here are not in dispute. Burnett was injured while camping in a designated campground in Cherry Creek State Park, which is operated by the CDNR. Burnett was sleeping in her tent in Campsite No. 14 when she was struck by a falling tree branch. The branch likely came from a stand of trees adjacent to and overhanging Campsite No. 14. These mature cottonwood trees likely existed before the park was established in 1959.[1] Some other campsites had no adjacent trees.

¶ 3 Burnett brought a negligence claim against the CDNR for her injuries. The trial court dismissed her claim for lack of subject matter jurisdiction because the state is immune from all tort claims under the CGIA, except where immunity is expressly waived, and no waiver applied. § 24–10–106(1), C.R.S.2012. This appeal followed.

---

1. The parties stipulated to the park manager's affidavit, which stated that none of the trees were on improved portions of Campsite No. 14, none of the trees were planted by state or park personnel, and the trees were mature cottonwoods that likely existed before the park was created in 1959.

## II. Standard of Review

¶ 4 Because the parties stipulated to the relevant facts, the trial court did not conduct an evidentiary hearing. The trial court held, as a matter of law, that there was no waiver of immunity under the CGIA here. We review a trial court decision based on statutory interpretation de novo. *Medina v. State*, 35 P.3d 443, 452 (Colo.2001).

## III. Analysis

¶ 5 The trial court held that while the campsite and campground were public facilities under the CGIA, the tree itself was not a public facility and the state retained immunity for injuries resulting from falling branches. *See* § 24–10–106(1)(e). Burnett contends that the trial court erred in dismissing her claim because the trees adjacent to Campsite No. 14 were part of a public facility, and the tree branches hanging over the campsite constituted a "dangerous condition of a public facility." *See id.*

¶ 6 Under the CGIA, the state waives immunity for injuries caused by a "dangerous condition of any … public facility located in any park or recreation area maintained by a public entity." § 24–10–106(1)(e). The act further states, "[n]othing in this paragraph … shall be construed to prevent a public entity from asserting sovereign immunity for an injury caused by the natural condition of any unimproved property, whether or not such property is located in a park or recreation area." *Id.*

■ ¶ 7 The CGIA weakened the common law of negligence by immunizing the government from tort liability, except where immunity is expressly waived. *See* § 24–10–106; *Medina*, 35 P.3d at 453; *Herrera v. City & County of Denver*, 221 P.3d 423, 425 (Colo. App.2009). We thus strictly construe its grant of immunity and interpret its waiver provisions broadly. *Medina*, 35 P.3d at 453; *Herrera*, 221 P.3d at 425. Nonetheless, we interpret a statute to give words and phrases their plain meaning in order to give effect to

the intent of the legislature. *Medina*, 35 P.3d at 453; *Herrera*, 221 P.3d at 425.

### A. The Pre–Existing Tree Is Not a Public Facility

■ ¶ 8 In determining that the tree from which the branch fell was not a public facility under the CGIA, the trial court followed *Rosales v. City & County of Denver*, 89 P.3d 507 (Colo.App.2004). In *Rosales*, a division of this court held that under the CGIA, a tree in a park or recreation area is not a public facility because a tree is not manmade or constructed. *Id.* at 510. The *Rosales* division concluded that the General Assembly intended the phrase "public facility" to mean something built or constructed by a public entity for a specific purpose.[2] *Id.* at 509; *see also Loveland v. St. Vrain Valley Sch. Dist. RE–1J*, 2012 WL 2581034, 2012 COA 112, ¶ 26, 328 P.3d 228 (*cert. granted* Feb. 25, 2013) (holding that under the CGIA, artificial playground equipment at a public school was a public facility because it was physically constructed). The *Rosales* division further concluded that a tree would be part of a public facility—and the state liable for injuries from it—only if it were "an integral part of the facility" and "essential for the intended use of the facility." 89 P.3d at 510.

¶ 9 We agree with the trial court's application of the *Rosales* test, and its determination that the tree adjacent to Campsite No. 14 is not a public facility. Trees are not integral to the use and enjoyment of a campsite merely because they provide shade, protection, and aesthetic values, and trees are not essential to the use of a campsite because campers do not need to use trees for camping. Indeed, the record reflects that some campsites in Cherry Creek State Park do not have adjacent trees.

### B. No Waiver for Conditions in Unimproved Areas

■ ¶ 10 According to Burnett, the campsite and surrounding trees are a "functional

2. This conclusion was based on *Webster's Third New International Dictionary* 812–13 (1986) definition of "facility" as something that is built or constructed for a particular purpose and the placement of the phrase "public facility" in sec-

tion 24–10–106(1)(e) with other constructed facilities, i.e., public hospital, jail, water facility, gas facility, sanitation facility, and electrical facility. *Rosales*, 89 P.3d at 509.

system" and collectively constitute a public facility for purposes of a CGIA waiver. We disagree.

¶ 11 By its plain language, the CGIA expressly retains immunity for "an injury caused by the natural condition of any unimproved property, whether or not such property is located in a park or recreation area." § 24–10–106(1)(e). While the campground and Campsite No. 14 were in improved areas of Cherry Creek State Park, the trees adjacent to Campsite No. 14 were in an unimproved part of the park. If the General Assembly intended to waive immunity for all dangerous conditions in public parks, it would not have limited that waiver to public facilities in parks or expressly retained immunity for natural conditions in unimproved areas. *See* § 24–10–106(1)(e); *Rosales*, 89 P.3d at 509.

¶ 12 This interpretation is fully consistent with Colorado cases holding that a condition is "dangerous" [3] for purposes of the CGIA's waiver of immunity only if it relates to the structural or physical condition of a facility or building. *Padilla v. School Dist. No. 1*, 25 P.3d 1176, 1183 (Colo.2001); *Walton v. State*, 968 P.2d 636, 645 (Colo.1998); *Jenks v. Sullivan*, 826 P.2d 825, 827 (Colo.1992), *overruled in part on other grounds by Bertrand v. Board of County Comm'rs*, 872 P.2d 223 (Colo.1994); *Douglas v. City & County of Denver*, 203 P.3d 615, 618–19 (Colo.App.2008) ("The supreme court has indicated that, in order for a public entity's immunity to be waived under section 24–10–106(1)(c), the dangerous condition must be associated with the construction or maintenance of the building and stem from the use of a dangerous or defective physical condition of the building itself.").

¶ 13 In *Jenks*, the supreme court explained that in the CGIA's definition of "dangerous condition," the term "or the use thereof," means the use of a physical condition of a

facility. 826 P.2d at 827. The *Jenks* court held that waiver only exists when injury is caused by a dangerous condition stemming from a physical or structural defect in a public building, not when it is caused merely by activities in a public building. *Id.* at 830 (holding that no waiver exists when plaintiff's injury was caused by a shooter on the steps of a courthouse because there was no physical or structural defect in the building).

¶ 14 In *Walton*, the supreme court stated, "Liability attaches for injury stemming from the public's use of a dangerous or defective physical condition of the building." 968 P.2d at 645 (holding that the state waived immunity for a student's injury when she fell off a ladder as a result of the university's negligent maintenance of a classroom).

¶ 15 In *Padilla*, the supreme court further clarified that waiver only exists when there is a defect in the physical structure itself, not when an injury is a result of the negligent use of a public facility. 25 P.3d at 1183 (holding that a plaintiff must "demonstrate a sufficient connection between use of the [building] and a construction or maintenance activity or omission for which the School District is responsible").

¶ 16 Two federal cases interpreting section 24–10–106(1)(e) hold that immunity is waived only when the alleged dangerous condition of a public facility is of a physical improvement to the park or recreation area. *DeAnzona v. City & County of Denver*, 222 F.3d 1229, 1237 (10th Cir.2000) (holding that the natural condition of land, even within a park, cannot lead to waiver of immunity); *King v. United States*, 53 F.Supp.2d 1056, 1070–71 (D.Colo. 1999) (holding that a fire pit built by students was not a dangerous condition of a physical improvement of government property), *rev'd in part on other grounds*, 301 F.3d 1270 (10th Cir.2002).

---

3. The CGIA's definition of "dangerous condition" is:

either a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately

caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility.

§ 24–10–103(1.3), C.R.S.2012. Having concluded that there was no waiver of immunity, the trial court here did not need to decide whether a dangerous condition existed.

¶ 17 We are not persuaded by Burnett's argument that the trees adjacent to Campsite No. 14 together with the campsite and campground form a "functional system," and thus constitute a public facility for purposes of waiving immunity under CGIA.

¶ 18 In support of her argument, Burnett cites several cases holding that the state waived immunity for dangerous conditions of objects on a highway. *See Medina*, 35 P.3d at 458; *State v. Moldovan*, 842 P.2d 220, 225 (Colo.1992); *Belfiore v. Colorado State Dep't of Highways*, 847 P.2d 244, 246 (Colo.App. 1993); *Schlitters v. State*, 787 P.2d 656, 658 (Colo.App.1989). These cases are distinguishable from the present case because the injuries in the highway cases arose from negligent maintenance of a highway, whereas here, Burnett's injuries were from natural conditions of an unimproved part of a state park.

¶ 19 In *Moldovan*, 842 P.2d at 225, the Colorado Supreme Court held that a state-maintained fence adjacent to a highway was an integral part of the highway system, and the state was responsible, pursuant to CGIA section 24–10–106(1)(d) and not under section 24–10–106(1)(e),[4] for keeping the fence in good repair to prevent it becoming a dangerous condition. The duty to maintain the highway and thus the fence, in turn, derived from another statute. *See* § 35–46–111(1)(a), C.R.S.2012. Here, Burnett fails to identify a corresponding duty to trim trees located in a natural area of a state park.

¶ 20 Likewise, in *Medina*, 35 P.3d at 458, the Colorado Supreme Court held that the state is required to ensure a highway remains in the same general state of repair as when it was originally constructed. The court measured the scope of the state's duty—and the scope of the CGIA waiver—in relation to

the original condition of the road. *Id.* at 448–49. Because the record did not disclose the state of the road as originally constructed, the supreme court could not determine if the alleged dangerous condition resulted from the lack of maintenance after initial design and construction of the road, or whether it came from the design itself. *Id.* at 449. Accordingly, it remanded the case for an evidentiary hearing. *Id.* In contrast, here Burnett and the state stipulated that the trees adjacent to Campsite No. 14 likely existed before Cherry Creek State Park was established. Unlike a constructed highway, the state did not create the stand of trees adjacent to Campsite No. 14, and thus it has no duty to maintain the trees relative to other pre-existing trees in other natural areas.

¶ 21 According to the Colorado Supreme Court, *Belfiore* and *Schlitters*—two cases Burnett relies upon—are "only marginally instructive" because they were decided pursuant to C.R.C.P. 12(b)(5), as opposed to C.R.C.P. 12(b)(1), and before *Trinity Broadcasting, Inc. v. City of Westminster*, 848 P.2d 916 (Colo.1993). *Medina*, 35 P.3d at 456. Both cases involved injuries to motorists when a boulder fell onto the highway. *Belfiore*, 847 P.2d at 246 (holding that boulder fell as a result of blasting activities on adjacent property, about which the Department of Highways had advance notice); *Schlitters*, 787 P.2d at 658 (holding that Department of Highways negligently failed to install devices that would have prevented boulders from falling onto a highway). In both cases, the state had constructed the road and had an independent duty to maintain the road. No such independent duty to trim trees in natural areas exists here.

---

4.  CGIA section 24–10–106(1)(d), as it existed at the time of Moldovan's injuries, waived immunity for dangerous conditions of a public highway as follows:

  Sovereign immunity is waived by a public entity in an action for injuries resulting from:

  . . .

  A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion . . . of any public highway, road, [or] street. . . . As used in this section, the phrase "physically

interferes with the movement of traffic" shall not include traffic signs, signals, or markings, or the lack thereof, but shall include the failure to repair a stop sign or a yield sign which reassigned the right-of-way or the failure to repair a traffic control signal on which conflicting directions are displayed, if such failure constituted a dangerous condition

  . . . .

Ch. 166, sec. 5, § 24–10–106(1)(d), 1986 Colo. Sess. Laws 876.

¶ 22 According to *Medina*, "*Belfiore* stands for no more than the legal proposition that if the plaintiff's injuries are the result of the state's negligent failure to maintain the right-of-way, then the CGIA waives the state's immunity in an action to recover therefor." 35 P.3d at 456. Similarly, *Schlitters* merely held that allegations that the state knew of numerous previous injuries involving falling rocks on the same segment of the road and negligently failed to install a device that would prevent rocks from falling were sufficient to state a claim for relief. 787 P.2d at 658. Here, however, Burnett did not allege that others were injured from tree branches falling from trees adjacent to Campsite No. 14 or that CDNR had notice that branches were falling from the tree or dangerously likely to fall.[5]

¶ 23 To the extent that Burnett argues that the CDNR had a duty to maintain the trees around Campsite No. 14, she fails to cite any authority, and we have found none, creating an affirmative duty on the part of state park personnel to prune or otherwise maintain trees in a natural area of a state park. Colorado courts have held that the state is liable for injuries caused only by its failure to maintain public buildings or highways in good repair. *See Springer v. City & County of Denver*, 13 P.3d 794, 804 (Colo.2000) (construing section 24–10–106(1)(c) waiver of immunity for dangerous conditions of public buildings); *Swieckowski v. City of Fort Collins*, 934 P.2d 1380, 1385 (Colo.1997) (construing section 24–10–106(1)(d) waiver of immunity for dangerous condition of a public highway). Colorado appellate courts have not, however, found that the state has a duty to maintain unimproved areas in parks or recreation areas. Burnett's proposed interpretation would unnecessarily expand the CGIA.

¶ 24 We decline to consider any arguments Burnett now makes that the trial court did not address. *See, e.g., Akin v. Four Corners Encampment*, 179 P.3d 139, 147 (Colo.App. 2007) (declining to consider whether petitioners had a statutory right to amend their

petition because the argument was not presented to the district court).

## IV. Conclusion

¶ 25 By the plain meaning of the CGIA, the CDNR retains immunity for injuries from branches falling from trees in unimproved parts of a state park. § 24–10–106(1)(e). We thus conclude that the trial court did not err in dismissing Burnett's negligence claim because the CDNR did not waive immunity for her injuries.

¶ 26 Judgment affirmed.

JUDGE MILLER concurs.

JUDGE CARPARELLI dissents.

JUDGE CARPARELLI dissenting.

¶ 27 In *Rosales v. City & County of Denver*, 89 P.3d 507 (Colo.App.2004) a division of this court remanded that case to the trial court for a determination of whether a tree from which a branch had fallen was and integral part of a public facility and was essential to public use of the facility. However, the division did not derive this standard from the words of the Colorado Government Immunity Act, sections 24–10–101 to –120, C.R.S.2012, and, in my view, it does not accurately reflect the CGIA or cases that apply it. Therefore, I conclude that the trial court erred when it applied *Rosales* and granted the Colorado Department of Natural Resources (CDNR) motion to dismiss.

¶ 28 I also disagree with the majority opinion's application of the second sentence of section 24–10–106(1)(e) (the natural condition provision).

¶ 29 Therefore, I respectfully dissent.

## I. Issues Raised

¶ 30 CDNR relied on *Sanchez v. School District 9–R*, 902 P.2d 450, 453 (Colo.App. 1995), to argue that section 24–10–106(1)(e), C.R.S. 2012, does not waive sovereign immunity because "the dangerous condition must arise from *the physical or structural defect of*

---

**5.** Burnett waived her right to an evidentiary hearing, pursuant to *Trinity*, by stipulating to the

facts, and thus failed to develop a further record.

*campsite structures,* not from [plaintiff's] use of the structures." (Emphasis added.) However, the passage from *Sanchez* upon which CDNR relied has been superseded by later supreme court decisions.

¶ 31 CDNR also relied on *Rosales,* arguing that "[a] tree located in a park is not a 'public facility' within the meaning of the [Colorado Government Immunity Act, sections 24–10–101 to –120, C.R.S.2012], unless the tree is an integral part of the structures *and* essential to their use." Consequently, the trial court applied *Rosales* and granted the motion.

## II. Issues Not Raised

¶ 32 CDNR's motion did not assert that (1) the tree did not constitute an unreasonable risk to the health or safety of campsite users; (2) it did not know or through the exercise of reasonable care could not have known that the tree constituted such a risk; or (3) the allegedly dangerous condition of the campsite was not proximately caused by its negligent act or omission in maintaining the campsite facility. CDNR did not raise these issues in its motion, the trial court did not rule on them, and they are not before us on appeal.

¶ 33 In this dissent, I address only the issues raised in CDNR's motion and in the majority opinion, and provisions of the CGIA that are necessary to resolve those issues.

## III. *Rosales*

¶ 34 In *Rosales,* the plaintiff was injured when a tree branch fell on her while she was picnicking in a city park. The trial court concluded that the tree constituted a public facility, and, on appeal, the defendant argued that this was error. A division of this court ruled that, contrary to the trial court's ruling, the tree was not a public facility. However, recognizing that the conclusion that the tree was not, itself, a facility, did not resolve the issue, the division opined that a tree "may be a component of [a] public facility" if a public entity incorporates it into a facility in a manner that it becomes an integral part of the facility and is essential for its intended use (integration and necessity). 89 P.3d at 510. In so doing, the division reframed the issue and, in effect, focused on whether the picnic area was a public facility and whether there

was a connection between the tree and the picnic area. *Id.* Unfortunately, the *Rosales* test of integration and necessity is not derived from the statute. Moreover, because it is subjective, it is more suited to a finding of fact than a conclusion of law. In my view, it should be abandoned.

## IV. Section 24–10–106(1)(e)

¶ 35 Because the CGIA is in derogation of the common law, we strictly construe the statutory grant of immunity in favor of the public entity. However, we broadly construe statutory waivers of immunity in the interest of compensating victims of governmental negligence. *Springer v. City & County of Denver,* 13 P.3d 794, 798 (Colo.2000).

¶ 36 As pertinent here, section 24–10–106(1)(e) waives sovereign immunity in an action for injuries resulting from, among other things, "[a] dangerous condition of any . . . public facility located in any park . . . maintained by a public entity."

¶ 37 Section 24–10–103(1.3), C.R.S.2012, defines "dangerous condition" as "a physical condition of a facility or the use thereof"

● "that constitutes an unreasonable risk to the health or safety of the public";

● "which is known to exist or which in the exercise of reasonable care should have been known to exist"; and

● "which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility."

## V. Physical Condition of a Facility

¶ 38 As I explain below, the term "physical condition," as used in section 24–10–103(1.3), refers to a physical state, condition, or situation that affects the use of a facility in a way that constitutes a risk to the health and safety of those who use it. Here, the facility is the campsite, not the tree. Contrary to CDNR's argument, neither the risk nor the injury must arise from a physical or structural defect of campsite structures. Nor must the source of the risk be essential to use of the facility.

### A. Risk to Users

¶ 39 In *Jenks v. Sullivan*, 826 P.2d 825 (Colo.1992), *overruled in part by Bertrand v. Board of County Commissioners*, 872 P.2d 223 (Colo.1994) (exceptions to the waiver of sovereign immunity are not in derogation of common law and are not to be strictly construed, overruling *Jenks* to the extent that it said that otherwise), the plaintiff was in a courthouse when he was shot by a party to a divorce case. The supreme court rejected the plaintiff's contention that the phrase "or the use thereof" included the shooter's use of the building. The court held that "[t]he phrase 'or the use thereof' means the use of a physical condition of a facility." *Id.* at 827.

¶ 40 In *Jenks*, the court explained that the word "condition" is defined as "[m]ode or state of being; state or situation; essential quality; property; attribute; status or rank." *Id.* (quoting *Black's Law Dictionary* 293 (6th ed. 1990)). Continuing, the court said "the statute refers to an injury arising from the state of the building itself or the use of a state of the building," not from the dangerous activities of a person using the building. *Id.*

### B. Physical Condition Defined

¶ 41 In *Walton v. State*, 968 P.2d 636 (Colo. 1998), a student suffered injuries when, responding to a request from a teacher, she climbed a ladder and the ladder slipped out from under her. The evidence showed that the school's custodian had recently stripped and sealed the floor, rendering it extremely slippery. The supreme court distinguished the student's use of the facility from the shooter's use of the courthouse in *Jenks*. It explained that the school had asked members of the public to use the school, the use was connected with the school's maintenance, the school had not provided a safe means for doing so, and the school knew or should have known that injuries could result from the dangerous combination of factors. *Id.* at 645. Thus, contrary to CDNR's argument, the case turned on the public entity's failure to provide for the safety of the user, not on the existence of a physical or structural defect.

¶ 42 Indeed, the supreme court and a division of this court reached the same conclusion some years before *Walton*. *See Stephen v. City & County of Denver*, 659 P.2d 666, 668 (Colo.1983) (addressing physical conditions of roads or highways that affect their use in ways that constitutes a risk to the health or safety of the public); *Hallam v. City of Colorado Springs*, 914 P.2d 479, 483 (Colo.App. 1995) ("A dangerous condition is not limited to those conditions that have their physical source in the highway surface itself.").

¶ 43 The supreme court provided further guidance in *Padilla v. School District No. 1*, 25 P.3d 1176 (Colo.2001). There, the court said that the decision in *Walton* "demonstrates that the case-by-case jurisdictional inquiry methodology requires courts to take into account varying definitions of 'physical condition,' 'constructing,' and 'maintaining.'" *Id.* at 1181. Continuing, the court said that although a structural defect is a "physical condition," the term "also includes other physical conditions that the governmental entity creates in association with constructing or maintaining a facility." *Id.* Reiterating the analysis in *Jenks*, the court said that "physical condition" includes a "'[m]ode or state of being; state or situation.'" *Id.* (quoting *Jenks*, 826 P.2d at 827). The court also noted that in *Jenks*, it had employed a narrow construction of the immunity waiver, that *Bertrand* overruled that aspect of *Jenks* and that Colorado courts now afford deferential construction to immunity waivers and "give broad scope to the term 'physical condition,' as evidenced in *Walton*." *Id.*; *see Schlitters v. State*, 787 P.2d 656, 658 (Colo. App.1989) ("a dangerous condition may exist if there has been a failure to maintain the roadside so as to avoid the presence of obstructions on the traveled portion of a state highway").

¶ 44 Therefore, contrary to CDNR's argument, there need not be a physical or structural defect, nor must the instrumentality and circumstances of the injury be integrated into and essential to use of a facility. *See City of Colorado Springs v. Powell*, 48 P.3d 561, 566 (Colo.2002) (commenting that areas surrounding a facility often affect the overall condition of the facility). Instead, "dangerous condition" includes physical conditions

that affect the use of a facility in a way that constitutes an unreasonable risk to the health and safety of those who use it.

¶ 45 Because CDNR's motion did not address the risk to users of the campsite, the trial court did not rule on the question.

### C. Maintaining the Safety of a Facility

¶ 46 " 'Maintenance' means the act or omission of a public entity or public employee in keeping a facility in the same general state of repair or efficiency as initially constructed or in preserving a facility from decline or failure." § 24–10–103(2.5), C.R.S.2012. It does not include any duty "to upgrade, modernize, modify, or improve the design or construction of a facility." *Id.*

¶ 47 In *Medina v. State,* 35 P.3d 443, 448 (Colo.2001), the plaintiffs were passengers on a charter bus traveling through Clear Creek Canyon on U.S. Highway 6 when they were injured by a large boulder that had dislodged from a "cut slope" above the road and crashed through the roof of the bus. The essential question was whether the dangerous condition was caused by negligent maintenance. To answer that question, the court provided a thorough discussion of the differences between negligent maintenance, for which the CGIA waives sovereign immunity, and negligent design, for which it does not. Appropriately, the court did not address whether the boulder was, itself, a public facility.

¶ 48 The supreme court held that "the CGIA waives immunity in an action for injuries resulting from the state's negligent failure to maintain a public highway." The court explained the development of a dangerous condition of a public highway creates a duty to return the road to " 'the same general *state of being, repair, or efficiency* as initially constructed.' " *Id.* (emphasis added) (quoting *Swieckowski v. City of Fort Collins,* 934 P.2d 1380, 1385 (Colo. 1997)).

### D. Conclusions Regarding Dangerous Condition

¶ 49 Broadly construing this statutory waiver of immunity in the interest of compensating victims of governmental negli-

gence, I conclude that, as pertinent here, section 24–10–106(1)(e) waives immunity when a public entity knows or in the exercise of reasonable care should have known that the physical state of a public facility or the physical situation at a public facility constituted an unreasonable risk to the health or safety of the public using the facility and the risk is proximately caused by the negligent act or omission of the public entity that maintains the facility. CDNR's motion did not address whether the tree limbs constituted an unreasonable risk to the health and safety of the public, whether CDNR knew or should have known about the risk, or whether the injury resulted from CDNR's negligence.

¶ 50 Accordingly, I conclude that the trial court erred when it dismissed plaintiff's claims based solely on its determinations that the tree "was not integral to the improved campsite and therefore the tree was not a 'public facility' as defined under [the] CGIA."

### E. Remand is Appropriate

¶ 51 I am not persuaded by CDNR's suggestion that plaintiff's stipulation of facts in this case and her waiver of a hearing on CDNR's motion enables CDNR to prevail on issues it did not raise and the trial court did not address. CDNR's argument framed the issue for the trial court, and the parties stipulated to facts relevant to that argument. Although it is plaintiff's burden to prove that the trial court has jurisdiction in this matter, I reject CDNR's suggestion that it should be permitted to prevail on issues it did not raise and the trial court did not address.

¶ 52 Therefore, on this record, I conclude that the trial court erred when it dismissed plaintiff's claims, and that neither the record nor the trial court's ruling enables us to affirm on other grounds.

### V. The Natural Condition Provision

¶ 53 I also disagree with the majority opinion's conclusion that the statute does not waive sovereign immunity because the tree is a natural condition of unimproved property.

¶ 54 In accordance with the second sentence of section 24–10–106(1)(e), we may not

construe subsections 106(1)(d) and (e) "to prevent a public entity from asserting sovereign immunity for an injury caused by the natural condition of any unimproved property, whether or not such property is located in a park or recreation area or on a highway, road, or street right-of-way."

### A. Unimproved Property

¶ 55 The CGIA does not define "unimproved property" or "improved property." Because there is no statutory definition of "unimproved property," we must assume that the General Assembly intended that it have its usual and ordinary meaning. *See Enright v. City of Colorado Springs,* 716 P.2d 148, 149 (Colo.App.1985).

¶ 56 "Unimproved property" usually refers to real property that is in its natural state. Unimproved property typically contains a variety of features such as shrubs, trees, rocks, ruts, ditches, cliffs, and watercourses. When property is unimproved, these natural features have not been disturbed.

¶ 57 For property tax purposes, the term "improvements" refers to "structures, buildings, fixtures, fences, and water rights erected upon or affixed to land." [6] § 39–1–102(6.3), C.R.S.2012. Considering this definition as guidance with regard to the issues here, it could be said that property is unimproved when no structures or fixtures are built on or affixed to the land.

¶ 58 Here, CDNR attached an affidavit of the park manager of Cherry Creek State Park, which said, among other things, that the campsite used by plaintiff had electric, water, and sewer connections, as well as a concrete parking pad, a level dirt pad, a picnic table, and a fire pit. I conclude that the concrete pad and electric, water, and sewer connections constitute "fixtures" because they have been physically incorporated into and affixed to the camping facility. *See* § 39–1–102(4), C.R.S.2012 (defining "fixtures"). Consequently, I also conclude that the campsite constitutes "improved property."

### B. Natural Condition

¶ 59 The term "natural condition of unimproved property" is susceptible of several meanings.

### 1. Injuries Occurring on Unimproved Property.

¶ 60 The natural condition provision might be applied to mean that a public entity may assert sovereign immunity when an injury occurs on unimproved property and is caused by a natural condition of that property. This is a plain and reasonable application of the provision. A public entity does not construct and maintain unimproved property, and a dangerous natural condition of the unimproved property cannot be said to have been proximately caused by the negligent act or omission of the public entity. Therefore, in my view, it would be correct to apply this provision in this way.

### 2. Injuries Caused by Natural Objects

¶ 61 The natural condition provision could also be applied to mean that a public entity may assert immunity when an injury is caused by an object or condition that commonly exists as a natural condition of unimproved property. If the provision is applied in this way, an entity could assert immunity whenever a shrub, tree, rock, rut, ditch, cliff, or watercourse causes an injury and the injury occurs on improved public property.

¶ 62 If the natural condition provision is applied in this way, a public entity that constructs and maintains a roadway will be immune even when it knows that a dead tree is on a roadway and negligently fails to remove or warn of the hazard, and a driver is injured as the result of the obstruction. Similarly, an entity that builds and maintains a playground will be immune when it knows there is a dead and rotting tree standing in the middle of the playground and negligently fails to remove the hazard, and the tree falls and injures someone.

---

**6.** Section 39–1–102(4.3), C.R.S.2012, defines "forest land" to mean "land of which at least ten percent is stocked by forest trees of any size and includes land that formerly had such tree cover and that will be naturally or artificially regenerated," including "unimproved roads and trails, streams, and clearings which are less than one hundred twenty feet wide."

¶ 63 We are required to construe section 24–10–106(1)(e) and the natural condition provision in the interest of compensating victims of governmental negligence. In my view, applying the natural condition provision to permit a public entity to assert sovereign immunity in an action for injuries resulting from its negligent failure to maintain the safety of a public facility not only is contrary to the interest of compensating victims of governmental negligence, but also leads to an absurd and illogical result.

### 3. Injuries on Improved Property Caused by Objects on Unimproved Property

¶ 64 The natural condition provision could be applied to mean that a public entity may assert immunity when an injury occurs on improved property that is a public facility and the injury is caused by something that is natural to and is situated on unimproved property.

¶ 65 In my view, it would be erroneous to apply the provision in this way because doing so would encourage public entities to leave a modicum of unimproved land around trees adjacent to public facilities. It would also encourage public entities to refrain from pruning those trees, lest the trees be considered "improved property." The reasoning would be that so long as the improvements do not touch the trunk of a tree, (1) the tree is situated on unimproved property; (2) the tree, itself has not been "improved"; and (3) the entity has no duty to ensure that the tree does not constitute an unreasonable risk to the health and safety of those who use the area of the facility immediately adjacent to the tree and under the branches of the tree.

¶ 66 Here, the photographs suggest that the vehicle pad and tent area may touch or nearly touch one side of the tree, but do not surround it. This presents yet another difficulty. When a public entity constructs improvements that touch one side of a tree, but do not surround the tree, and the tree's limbs overhang the public facility, courts would be required to determine whether the improvement causes the tree to be situated on improved or unimproved property. We would also be required to determine whether tree limbs that overhang a public facility are a natural condition of unimproved property or a physical condition or situation of improved property.

¶ 67 Once again, applying the natural condition provision to permit a public entity to assert sovereign immunity in an action for injuries resulting from the entity's negligent failure to maintain the safety of a public facility is contrary to the interest of compensating victims of governmental negligence.

### VI. Conclusion

¶ 68 I conclude that the *Rosales* test of integration and necessity is not derived from the statute, unduly subjective, and should be abandoned. I also conclude that the natural condition provision must be applied in the interest of compensating victims of governmental negligence. Accordingly, I conclude that the trial court erred when it dismissed plaintiff's action based on its determination that the tree "was not integral to the improved campsite and therefore the tree was not a 'public facility' as defined under [the] CGIA."

¶ 69 Because the trial court considered and ruled only on these issues, I do not address issues regarding the existence of a risk, CDNR's knowledge of a risk, or CDNR's alleged negligence. I would reverse and remand for further proceedings.

¶ 70 For these reasons, I respectfully dissent.